Good morning, Your Honors. May it please the Court, my name is Jennifer Wellman and I represent Keith Russell. The District Court's decision of holding the warrantless search in this case should be reversed for two reasons. Unless Your Honors have questions for me with respect to the first, I'd like to focus my time on the scope of the search. As Your Honors well know, the validity... What's the first? The first is consent, you mean? Yes, Your Honor, the voluntariness of the consent. I agree with you. We should go right to the second. The validity of the search in this case, as Your Honors know, depends entirely upon the consent of Mr. Russell. And the standard for measuring the scope of any purported consent is objective reasonableness. What would the typical person, reasonable person, have understood by a general consent to search for narcotics? The government would like this Court to rule that a general consent to search for narcotics includes the invasive search of our most private body parts in the middle of a busy concourse. But that is not objectively reasonable to believe. How did this search differ from the search that your client had just gone through at TSA? I've been through some pretty intrusive searches at TSA security checkpoints. That's correct, Your Honor. But I think all of us, when we go through TSA, we do give a general consent to search. What the officers do, if they're going to use, I think it's called a magnometer, or now the body scanners, they tell us what they are going to do. They take us to a more private area. And we do assume the stance that Mr. Russell is alleged to have taken in this case, and the officers testified to. But I think it would be hard-pressed to believe that any one of us in that circumstance would believe, by doing that, by taking that stance, and agreeing to undergo the wand or the body scanner, that we are allowing the TSA officers to then grab or touch in any way, manipulate our genitals, or for females, our breasts. Let me ask, the district court said something to the effect, when one consents to a search of your person, I don't believe that one has to say, nor does the officer have to ask, well is it okay if I search your feet? Is it okay if I search your shoulders? How about your private parts? Once you consent to a search, you consent to a search which is done outside the clothing. It's not a body cavity search. What is your response to the district court's characterization of the issue? I think it's wrong. I think it's equating our shoulders to our most private parts, that we have been told since we were young children, should not be touched without warning. The government tries to make the analogy that this is equivalent to the search of a trunk of a car, a consensual search to the trunk of a car. It's well established that we have a limited... Well, that's kind of a far-fetched analogy. I don't think it's the trunk of a car. But if somebody comes up to you and says, hello, may I search you? And you say yes, then are they supposed to, what is the protocol? You think the officer then has to ask, oh, and may I touch here, may I touch there? Or tell us how this works in practice. I think the remedy that we're asking for is consistent with the jurisprudence as well as simply saying when you go to this area, there is no Ninth Circuit case that condones the extension of a general consensual search to the most private part of our bodies. How does this search differ from a Terry v. Ohio pat-down frisk for weapons? Well, a Terry permits a frisk if the officer reasonably believes that he's in danger or his officers are in danger. It includes looking for hard objects which can be concealed in the groin area, does it not? It includes a pat-down. It does not include what we have here, a lifting and squeezing of the private areas. And, in fact, the Supreme Court in Minnesota v. Dickerson. As a practical matter, how is that going to be any different from a pat-down frisk for weapons? I mean, you're still going to be touching the person being searched in the groin area, and the Supreme Court in Terry described it as a squeezing type of a search in order to look for weapons. I think, in order to answer your question, I would go back to this circuit has never said that a consensual encounter of this nature in a busy airport concourse is the equivalent of a Terry stop. I understand that, but the closest analogy I can think of to an exterior search is a Terry frisk. And I'm trying to understand from your argument how this particular search differed in any significant way from a pat-down frisk for weapons that would otherwise be conducted in a publicly viewable place in a traditional Terry stop. Your Honor, I think to answer your question, I would direct Your Honor to look at the description of the search in this case, compare it with the description of the search in Blake, and as well as the search in Rodney. And I would say that the search is more like Blake. With all due respect, I don't think you're answering my question. How does this search differ from a Terry pat-down frisk for weapons? Because in this search, the officer went underneath his groin and squeezed his testicles and his body parts, looking for anything that wasn't human anatomy. So he's touching, squeezing, and lifting. But wouldn't that also be the case in a Terry search if you had a small weapon, whether it be a switchblade knife, a .22 caliber pistol, something that would not otherwise be particularly large but easily concealed in that part of the body? I would respectfully disagree. I think that the Terry cases that condone the Terry stop searches, there's a pat-down, there's no squeezing or grabbing. And the Supreme Court in the 90s in Minnesota v. Dickerson actually specifically said, squeezing, sliding, and otherwise manipulating objects or areas on a suspect's person falls outside the bounds of a pat-down frisk. Now, in that case, it was just simply, as Your Honor noted, a firearm in somebody's pocket, not something underneath behind our human anatomy. What about, you know, the comment you made is important, and it does ring true that the Ninth Circuit hasn't addressed this precise issue before. But it seems that the other circuits in looking at drug searches in the groin area or weapons have condoned those. And the Eleventh Circuit seems to be split between itself on this issue. Your Honor, I think it highlights the fact that it's a very fact-specific determination. The Rodney case that the government relies upon does not have the kind of touching that they had in Blake. And I think in Blake we have, within seconds, not only the touching that Your Honor, Judge Tallman, was describing earlier with respect to the Terry stop, but also, quote, outside of Blake's trousers in the area between the legs where the penis would normally be positioned, end quote. So there we have a very similar kind of touching that we have in Mr. Russell's case. And the Rodney decision really set out the limits of its decision to those particular facts and did not draw the line at body cavity searches. And, in fact, emphasized that this was a sweeping motion in that case. But this isn't a body cavity search. That's correct. My point is that the line should not be drawn, well, this isn't a body cavity, and therefore everything else short of that is okay. The Eleventh Circuit in Rodney does say, for example, although drugs can be hidden virtually anywhere or in one's person, a generalized consent to a body search for drugs surely does not validate everything up to and including a body cavity search. The government is really, the logical conclusion of the government's argument is they want this court to equate our most private body part to the trunk of a car, suggesting to this court that you should find that a general consent to search for narcotics gives the officer's license to touch our most private parts, and in this case lift and squeeze his body parts in his groin area. Do you want to reserve time for rebuttal? I would love to, Your Honor. Thank you. Good morning, Your Honors. May it please the Court, my name is Sunny Koh, an Assistant United States Attorney for the Western District of Washington, representing the government on this appeal. I'd like to start off, first of all, commenting on what Your Honor, Judge Tolman,  A terry search doesn't authorize, for instance, for the officer to squeeze a woman's breast, does it? Your Honor, it does allow for a pat-down. But you can hide stuff in your bra, right? Yes, you can. Can you, you know, squeeze around the breast to feel if there's a hard object there in a terry style? Your Honor, the terry case. Answer my question, can you? Yes, I believe it does. Can? Can you give me a case that says that? Your Honor, the definition of squeeze, I believe, can be very different. My definition can be very different than Your Honor's definition. What is your definition of squeeze of breast? Your Honor, the definition, the Webster's Dictionary definition, is that you minimize the space between two objects. And in this particular case, I disagree with Ms. Wellman's characterization of what occurred, because when the officer was describing what he did, he stated that he squeezed or pushed. He used those words interchangeably. And in describing exactly what he meant by that, he stated that he lifted up. And the testimony was that the defendant was wearing baggy pants. And when he lifted up, he was basically minimizing the space between where the pants hung and where the defendant's testicles were. And so when he minimized that space. He just lifted up the clothing and not the testicles? Is that what you're saying? Your Honor, the testimony excerpts record 41. The defendant was wearing baggy pants. I know that, but is that what you're saying? All he did was lift up the clothing? Your Honor, yes. Which officer is this? Officer Brooke. Okay, what page? Page 41. What? 41. 41? Go ahead. Yes. When he lifted up, because the defendant was wearing baggy jeans, he was minimizing the space between where the pants hung and where the defendant's testicles were. And when he did that, he came in contact with a baggy containing 700 OxyContin pills. And when he was describing in his own words what he did, he stated on excerpts of record 117, it's my standard operating procedure for a frisk of an individual. I know, but that's not the test. The test is not, you know, what a policeman would like to do. The test is what a reasonable, ordinary citizen, right, thinks is included in the consent. Your Honor? Isn't that right? Yes. So I don't think his testimony, you know, helps you in what an ordinary citizen thinks is reasonable. An ordinary person, when that person assumes a frisk position, which the defendant did in this particular case, without being asked, without being prompted, he immediately spread his feet, spread his legs, raised his arms. There could be no clearer indication to a reasonable person that that person, assuming the frisk position, is consenting to a search of his body, fully clothed, over the clothing, frisk, which encompasses a touching of the groin area. Well, even as Judge Tomlin noted, that can happen going through, for example, TSA security. But in that case, they take you out of the public view, if they're going to do that kind of a search at your request. So why, from a reasonableness standpoint, even if it was reasonable to be able to search this area, was it reasonable to do so in that location in full public view? Your Honor, the cases have repeatedly stated, and I would note to the Berry case in particular, to take someone from that public arena to a more private area, such as a DEA office, without being asked to be taken there, that that is tantamount to a seizure. And to take one person from the public place to a private setting, in addition to your... Perry was in an office. The search was in an office. They took him to a little office. Yes, they took him to an office. And moving the person from public view, moving to a place where things could happen where there could be no witnesses, the courts have repeatedly stated that that is, in fact, could be constituted as a seizure. And so the police, law enforcement, are encouraged to do so, this type of brief consensual encounter in a public place, so that the person does not feel that he's being so singled out that he, in fact, is perhaps being even arrested. And so the courts, again, have stated that without probable cause, you should not take a person to a private arena. Ms. Cote, is there anything in the record that tells us how large the bag he was containing the 700 pills? There wasn't a specific record about how large it was, just that it was a plastic bag containing 700 OxyContin pills. And it was placed in his body in such a way, underneath the spandex, underneath another box for shorts, underneath baggy jeans, so that when he passed through TSA, no one saw that. It was unobservable. When he walked down the corn concourse, it was unobservable. Without the touching, it would not have been found. Well, your argument seems to me, Officer can do anything he has to do in order to find it. Is that your argument? Your Honor, my argument is that if it's minimally intrusive, if it's likened to a Terry frisk, as the other courts have said it's okay to do, if you're doing that in a public area, and it's over the clothes, then yes, touching of the groin area is okay if the person explicitly consents, which Russell did in this case. Would it be okay to go into the underpants as long as you did it from the outside? If the officer reached in, if the officer clearly observed the baggy, the hidden narcotics, and saw that it was there, then. How could he clearly observe it if it's hidden in the undies? I think in one of the cases, Your Honor, the facts were that the baggy was felt and was observed. And so I believe it was in the Rodney case where because it was observed, the court said it was okay to reach inside and take it out. And that's where the government's position would be, is that if it's felt there's reasonable suspicion at that point, that there is certainly criminal activity, there can also be an arrest at that point if there's probable cause for an arrest. And if that's the case, then you certainly should be able to reach in and grab the baggy of narcotics. That did not happen in this case, though, is that right? That did not happen in this case. They took him to the CTAC office before they reached in after he was placed under arrest? That's correct, Your Honor. Okay. It was only felt, and then he was arrested. He was taken to the office. If Your Honors have no additional questions, I would rest on my brief and ask Your Honor to affirm. Thank you. Thank you. Ms. Wellman, you have some time. Thank you, Your Honor. I'd just like to make three points. With respect to the description, I would direct Your Honors to ER 40, where when asked to describe the search of the groin area, Officer Brutsch specifically says it would be the same as squeezing around the ankle or squeezing, you know, just trying to feel what objects are there. So I reached underneath his groin, underneath his testicles, and I lifted up to feel if there were any objects, anything hard or anything unnatural, that's not part of the human anatomy. The second point I would like to... Was there any indication in the testimony as to specifically where the baggie was inside the clothing? No, Your Honor. So we don't know if it was hanging beneath or to the side or anything of that nature? No. The officers did testify, however, it was not visible to the naked eye, unlike some of the cases that the government has cited, too. And did I correctly understand, Ms. Cote, he's actually wearing three articles of clothing, spandex, boxers, and then a pair of baggy pants? Your Honor, I don't remember that detail in the transcript. I would refer to the transcript as I can. Of course, he was going to Alaska, right? That's right. It's cool there. The second point, very quickly I want to make, if Your Honors look at the Million V. Rodriguez out of the 11th Circuit, it makes clear that a general consent to search for narcotics in the 11th Circuit, which is, of course, the same as Rodney, does not tolerate the manipulation in any way of the private parts. And the third point is, as Your Honors pointed out here, Mr. Russell was never warned or taken to a more private area, and the government argues that that somehow thwarts their efforts, that drug couriers will get away. I would simply say, first, that this was not the only arsenal in law enforcement. This was a three-hour flight to Alaska. If he really was free to leave, he could have said no and gone on the plane, and they could have called the agent in Alaska, who they've already talked to, and undergone the surveillance and in those three hours done more investigation regarding Mr. Russell. Two, we are not saying at which time, while he was on this three-hour flight, he would have plenty of time to dispose of this item, correct? Well, that brings me to my second point, the fear of not being able to stop criminal conduct. While it's a laudable goal, of course, for law enforcement, there's not one case that suggests that that gives law enforcement the right to stomp on every individual's constitutional rights, whether or not they are. I'm sorry, Ms. Willman, I'm missing your point. Are you now going back to the issue I thought that you were going to leave to your brief, which was whether or not there was reasonable suspicion to stop him? No, I apologize, Your Honor. I was responding to the government's suggestion that because sort of this ends justifies the means and because this helps law enforcement. If they hadn't done this kind of touching, therefore, they would not have stopped Mr. Russell. Wouldn't we have had the same problem at the Ted Stevens Airport that we had at SeaTac once he got off the plane? I mean, what more would the agents have learned during the three-and-a-half hours the plane was in the air? Well, they could have undergone surveillance. The Alaska agents could have followed him, and they could have developed probable cause. They could have tried then to do a consent search. We don't know what they would have done, and I would suggest that the idea that we don't know what could have happened, how that somehow saves the search here. And really my point is the validity depends on consent. The government wants to push the boundaries of that consent as far as it can go, but we all know that searches are controlled by reasonableness, and we believe it was unreasonable in this case. Or by the defendant simply saying to the officer, don't touch me there. Your Honor, he did not say that, but, again, that assumes that lifting and touching are private parts. No, no, no. My point is that the scope of the consent is totally within the hands of the person giving the consent, and he could readily have said to the agent, as the agent moved up from his ankles, I'm revoking my consent or I don't want to be touched in that part. Which was what happened, I think, in the Eighth Circuit case in Sanders. In Sanders, Your Honor, that was a hotel search in which the client or the defendant repeatedly tried to put his arms down, and we do not have that kind of time here. The testimony at ER 127 is that this happened within seconds. So Mr. Russell testified that it went from the pockets to the groin. The officer testified it went from the legs to the groin area. Either way, the time was within seconds that he was lifting and squeezing his testicles. Thank you. I think we have your argument well in mind, and we've given you quite a bit of extra time. Thank you, Your Honor. I'd like to thank both counsel for your argument this morning. The case of United States v. Russell is submitted. The next case, Breyer v. Palis, is submitted.
judges: Tashima, McKeown, Tallman